```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                        DISTRICT OF VERMONT
```

SECURITIES AND EXCHANGE COMMISSION,   :
                                      :
     Plaintiff,                       :
                                      :
          v.                          :   Case No. 2:05-cv-188
                                      :
TERRY'S TIPS, INC., a Vermont         :
corporation, and TERRY F. ALLEN, an   :
individual,                           :
                                      :
     Defendants.                      :

MEMORANDUM OPINION and ORDER
----

The Securities and Exchange Commission ("SEC") has sued Terry's Tips, Inc. ("Terry's Tips") and Terry F. Allen, the founder and owner of Terry's Tips, for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (West 1997), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and violations of Sections 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C.A. §§ 80b-6(1), (2) (West 1997).  The Defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

Background
----

The following facts are taken from the complaint and any documents upon which it relies.[1]  *See Rothman v. Gregor*, 220 F.3d

---

[1] The Defendants have provided copies of e-mails and website pages referenced in the SEC's complaint.  The SEC notes that these materials, produced some months after the complaint was filed, may not be identical to the materials referenced in the complaint, but it has not objected to consideration of their

81, 88-89 (2d Cir. 2000).  Terry's Tips is an online financial adviser that makes recommendations regarding options trading.  It was created by Allen on May 6, 2003.  Before 2003, Allen marketed options trading strategies and investment newsletters through a website at www.terrystips.com.  In 2003, Terry's Tips began to offer auto-trading to its subscribers.

   Auto-trading is an investment vehicle in which subscribers to online investment newsletters open auto-trading accounts with brokerage firms, and authorize the online adviser to direct the trades in the subscribers' accounts.  Auto-trading services are typically offered as an additional service provided by online financial newsletters.  The financial newsletters usually require subscribers to pay a fee to auto-trade in addition to the subscription fee paid to receive the general newsletter.  The online adviser has arrangements with one or more broker-dealers that accept the adviser's auto-trading customers.  The auto-trading customer sets up a brokerage account with a broker-dealer and executes a power of attorney or trading authorization authorizing the broker-dealer to automatically execute trades in the customer's account on instructions from the online adviser.  Once the brokerage account is established, the online adviser sends specific trading instructions by e-mail or facsimile to the broker-dealer.  These instructions are timed to take advantage of

---

contents for purposes of this motion to dismiss.

market events, and the customer usually learns of the trades only after they have been executed by the broker-dealer.

Terry's Tips offers at least nine different auto-trading strategies to subscribers.  A person who wishes to engage in auto-trading with Terry's Tips receives an e-mail publication from Terry's Tips called "Auto-Trade 101."  This e-mail recommends, but does not require, that the client open a brokerage account at one of two broker-dealers that have auto-trading arrangements with Terry's Tips.  The account must contain a minimum of $5,000.00.  The e-mail instructs the subscriber on how to open an account, designate Terry's Tips as the adviser on the account, and authorize the broker to execute trades based on instructions from Terry's Tips.

Upon subscription to its auto-trading service, and after the brokerage account is set up, Terry's Tips sends specific trading instructions known as "trading alerts" to the designated broker, and the broker executes trades in the subscriber's account consistent with the information in the trading alert.  After Terry's Tips sends a trading alert to the broker, Terry's Tips either posts the alert on its website or sends a copy of the alert to the subscriber.  The trading alerts are timed to specific market activity, and are not issued on a regular basis. Terry's Tips' financial newsletter, the Options Tutorial, issues regularly, however.

Terry's Tips has set up a separate e-mailbox for questions from auto-trading customers. Allen or a member of Terry's Tips staff personally responds to all subscriber e-mail and telephone inquiries regarding auto-trading. Allen or a member of Terry's Tips staff provides individual subscribers with specific advice on matters such as the degree of risk associated with each auto-trading strategy, which of the several strategies to select given the subscriber's investment objectives, and when to switch from one strategy to another.

The complaint alleges that Allen and Terry's Tips deceived their subscribers through false promises of unrealistic and unreasonable investment returns. They told their subscribers that their money was safely invested and that the subscribers would not experience substantial losses. Allen and Terry's Tips encouraged subscribers to adopt their auto-trading program for their IRAs because the risk was so low. Terry's Tips' website claims that its "10K" auto-trading strategy will yield substantial profits in most trading markets; will produce more than 100% (annualized) every month if the stock stays flat, goes up by any amount, or falls by less than 5%; and that this strategy works best with the Nasdaq 100 tracking stock for a variety of reasons. The complaint alleges that these statements are false and misleading.

Terry's Tips subscribers have not realized gains of more

4

than 100% per month (annualized); instead many have lost between 60% and 100% of the amount invested.  The complaint alleges that the auto-trading strategy's performance statistics would have been important to the reasonable investor in determining whether or not to subscribe to Terry's Tips' auto-trading service, and that Allen either knew or was reckless in not knowing that the performance statistics on Terry's Tips' website were false and misleading.

## Discussion

Count One of the complaint alleges fraud in connection with the purchase and sale of securities, violations of Section 10(b) of the Exchange Act, and of Rule 10b-5.  Specifically, the complaint alleges that Allen and Terry's Tips, in connection with the purchase and sale of securities, used interstate commerce or the mails, with scienter, and (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material facts or omitted material facts; or (3) practiced fraud or deceit upon others.

Count Two alleges that the same conduct constitutes fraud by an investment adviser, in violation of Sections 206(1) and (2) of the Investors Advisers Act.  Count Three alleges that Allen aided and abetted Terry's Tips' violations of the Investment Advisers Act.

The Defendants seek dismissal on the grounds (1) that the

federal securities laws do not apply to their publishing activities; and (2) that fraud is not pled with the requisite particularity.

I.   Legal Standard

Dismissal for failure to state a claim is not appropriate unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999).  All factual allegations in the complaint are accepted as true and all inferences are drawn in the light most favorable to the plaintiff.  *See Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 213 (2d Cir. 2003).

II.  The Investment Advisers Act Counts

Sections 80b-6(1) and (2) of Title 15 United States Code make it unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly to (1) employ any device, scheme, or artifice to defraud any client or prospective client; or (2) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.  15 U.S.C.A. § 80b-6(1), (2).  The Defendants argue that they are not investment advisers, and so do not come under the sections' prohibitions.

The Investment Advisers Act was primarily intended to

regulate the business of rendering personalized investment advice, including publishing activities connected with that advice.  *Lowe v. S.E.C.*, 472 U.S. 181, 204 (1985).  "Investment adviser" as used in the Act "means any person who, for compensation, engages in the business of advising others, either directly or through publication or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."  15 U.S.C.A. § 80b-2(a)(11) (West 1997).  The Defendants' publications appear to bring them within the Act's definition.  But the Act excludes some categories of persons from its definition of an investment adviser, and one category that is statutorily excluded is "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation."  § 80b-2(a)(11)(D).

As the Supreme Court explained in *Lowe*, Congress did not intend to exclude publications that are distributed by investment advisers as a normal part of the business of servicing their clients.  *Lowe*, 472 U.S. at 204.  But, sensitive to First Amendment concerns, it wanted to make clear that it did not seek to regulate the press by regulating non-personalized publishing activities.  Its gloss on "bona fide publication" suggested that

such a publication would "contain disinterested commentary and analysis as opposed to promotional material disseminated by a 'tout.'" *Id.* at 206.  Publications with a "general and regular" circulation would not include intermittent bulletins concerning the advisability of buying and selling stocks or "hit and run tipsters." *Id.*

The Defendants' publications do not contain completely disinterested commentary, and do contain promotional material. That would suggest that they do not fit the exclusion.  But the Supreme Court went on to specify that the Act was designed to apply to persons engaged in the investment-advisory profession: those who provide personalized advice attuned to a client's concerns, whether by written or verbal communication. *Id.* at 207-08.  Publications that do not offer individualized advice attuned to any specific portfolio or to any client's particular needs, that circulate for sale to the public at large in a free, open market, were not intended to be regulated. *Id.* at 208.  The Defendants' financial newsletter circulates for sale to the public at large, and offers non-personalized advice about options trading.  If the only activities engaged in by the Defendants were the publication of their online newsletters containing non-personalized advice about options trading, they would be excluded from the definition of "investment adviser" under § 80b-2(a)(11)(D).

Regardless of whether the Defendants as publishers of a financial newsletter of general and regular circulation are excluded from the definition of investment adviser, the question remains whether the Defendants' other activities bring them within the definition.  The complaint sufficiently alleges facts that if proven could show that the Defendants are investment advisers.  Specifically, the complaint alleges that the Defendants advise their subscribers individually, by telephone or e-mail, as to the degree of risk associated with each auto-trading strategy, which of the several strategies to select given the subscriber's investment objectives, and when to switch from one strategy to another.  Complaint ¶¶ 23, 40, 41, 42 (Doc. 1).  The Defendants are compensated for that advice, in that they receive payment for their auto-trading services in the form of monthly subscriptions, over and above the subscription fees for the newsletter alone.

Because the complaint has alleged facts that Defendants, for compensation, are engaged in the delivery of personalized advice on options trading to their auto-trading subscribers, dismissal of Counts Two and Three is not warranted on the basis that the Defendants are not investment advisers.[2]

---

[2] The Defendants have also argued that, as disseminators of protected speech, they cannot constitutionally be subjected to liability under Section 206(2), which lacks a scienter requirement, because "the potential for such liability would chill free speech."  Defs.' Mem. at 14 (Doc. 9).  Scienter is not

III. <u>The Exchange Act Count</u>

The Defendants challenge the application of the Exchange Act to their conduct because they contend that the alleged fraud was not in connection with the purchase or sale of a security. They claim that they sell information, not securities.

In order to prove that the Defendants violated Section 10(b) of the Exchange Act, the SEC must establish that they (1) made a material misrepresentation or a material omission, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). The Defendants' motion to dismiss challenges the third element.

The "in connection with" element is satisfied when the misrepresentation or omission or use of a device would be the sort of conduct on which a reasonable investor would rely, and, so relying, would purchase or sell securities. *In re Carter-*

---

an element of a violation of Section 206(2). *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). The Defendants' argument is premised on their contention that they are not investment advisers, but publishers of impersonal speech, a contention that the SEC will be permitted to attempt to disprove. Moreover, untruthful commercial speech is not protected for its own sake. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974 (there is no constitutional value in false statements of fact). "[T]here is minimal danger that governmental regulation of false or misleading . . . product advertising will chill accurate and nondeceptive commercial expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 n.22 (1984).

*Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998). The "in connection with" requirement is construed broadly and flexibly to effectuate the remedial purposes of the federal securities laws. *SEC v. Zandford*, 535 U.S. 813, 819 (2002).

Paragraph 47 of the complaint has alleged facts that if proven could show that the Defendants provided false or misleading information to their auto-trading subscribers upon which reasonable investors would rely in the purchase or sale of securities. Because the complaint has alleged facts that would support the "in connection with" element of Section 10(b) of the Exchange Act, the Defendants are not entitled to dismissal of Count One.

IV. <u>Pleading Fraud With Particularity</u>

The Defendants argue that the SEC has failed to state a claim for securities fraud because it has failed to allege the fraud with particularity. Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b)'s particularity requirement provides defendants with fair notice of a plaintiff's claim and safeguards reputations from improvident charges of wrongdoing. *Id.* at 171. A complaint must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 170.[3]  The SEC contends that the requisite particularity is satisfied by the allegations in paragraphs 46 through 49 of the complaint:

¶ 46.   Terry's Tips represents, in numerous locations on its website, that its strategies can be expected to achieve outstanding performance returns.

¶ 47.   The website also claims that Terry's Tips' "10K Strategy" – a strategy which can be used to trade any security – will yield substantial profits in most trading markets.  The website also claims that the 10K strategy " . . . . will make over 100% (annualized) every month if your stock stays flat, goes up by any amount, or falls by less than 5%."  The website also claims that this strategy works best with the Nasdaq 100 tracking stock for a variety of reasons (primarily liquidity and very small difference between bid and ask prices) listed on the website.  These statements are false and misleading.

¶ 48.   Terry's Tips' clients have not realized gains of over 100% (annualized) every month as stated on the website.

¶ 49.   Between November 2003, when Terry's Tips began its auto-trading program, and October 2004, the Nasdaq 100 tracking stock has either risen or fallen less than 5% every month except July 2004.  Despite this favorable movement in the price of the Nasdaq 100, clients invested in auto-trading strategies based on the Nasdaq 100 tracking stock have lost substantial amounts of money ranging from 60% to 100% of the amount invested.

Paragraph 47 sets forth three quite specific statements that the SEC claims are false and misleading and form the basis for its claim of fraud against the Defendants: (1) that Terry's Tips'

---

[3]  The Defendants do not argue that the complaint is deficient for failure to identify the speaker or to state where and when the statements were made; accordingly the Court addresses the first and fourth criteria for pleading fraud with particularity.

10K strategy will yield substantial profits in most trading markets; (2) that the 10K strategy will make over 100% (annualized) every month if a stock stays flat, goes up by any amount, or falls by less than 5%; and (3) that this strategy works best with the Nasdaq 100 tracking stock.

"'Puffery' or 'misguided optimism' is not actionable as fraud." *Rombach*, 355 F.3d at 175.  It may be, on a more fully developed record, that the SEC will fail to show that Defendants' statements were any more than that.  Nevertheless, for purposes of a motion to dismiss, the SEC has adequately specified the fraudulent statements and alleged why they were fraudulent.  It has alleged that Allen is responsible for the performance statistics; that he was aware that his strategies were performing so poorly that he offered to stop charging certain of his auto-trading subscribers until they recovered some of their losses; and that he either intentionally or recklessly allowed false and misleading performance figures to be published and to remain on Terry's Tips' website.  Complaint ¶¶ 46, 51, 53, 55.

    A.    The "Bespeaks Caution" Doctrine

Under the "bespeaks caution" doctrine, when cautionary language is included in the allegedly fraudulent materials, they must be analyzed in their entirety to determine whether a reasonable investor would have been misled.  "The touchstone of the inquiry is not whether isolated statements within a document

13

were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). The Defendants contend that the statements quoted in ¶ 47 of the Complaint are qualified by a statement on the same website page that this performance is not guaranteed.

The "bespeaks caution" doctrine is limited, in this circuit, to forward-looking, prospective representations. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). "Historical or present fact—knowledge within the grasp of the offeror"—is not protected. *Id.* Thus,

> [c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired. . . . 'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty the Grand Canyon lies one foot away.'

*Rombach*, 355 F.3d at 173 (quoting *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). The SEC claims that Allen and Terry's Tips failed to disclose a risk that had already transpired. The complaint alleges that the Defendants were representing to subscribers that the 10K auto-trading strategy would generate 100% (annualized) returns under certain conditions, while investor portfolios were suffering losses between 60% and 100%. The cautionary language on the

14

Case 2:05-cv-00188-wks   Document 20   Filed 01/09/06   Page 15 of 17

website page is followed immediately by a statement that suggests that an investor can make more than 100% even when a stock falls by more than 5%, one of the conditions cited by Terry's Tips for successful use of its 10K strategy.[4] In context, this "cautionary" statement sounds an extremely faint warning.

Although the Defendants may be able to demonstrate on a fuller record that the statements would not as a matter of law be considered fraudulent, the SEC has adequately alleged representations or omissions that could mislead the reasonable investor.

B.   Scienter

The Defendants also object that scienter has not been pled with the requisite particularity. The SEC's complaint states at various points: Allen was responsible for the performance statistics on the website (¶ 46); he directed the trading (¶¶ 35-37); he knew his strategies were not performing consistent with his claims (¶¶ 51-53); Terry's Tips continued to solicit new subscribers using false performance results, despite losing

---

[4] The website page excerpt containing the cautionary language reads as follows:
> Okay, anything this good must have some drawbacks, so here they are:
> 1.   I can't guarantee a 100% return in one year. But I will show you <u>every trade</u> I made to make 124% in Fannie Mae (a stodgy old conservative stock) a year when the stock fell by 8.4%. You get this free report as a bonus for <u>signing up for my free newsletter</u>.

(Doc. 10, Ex. E.)

between 60%-100% of client funds (¶¶ 49, 55).

"The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  A securities fraud action must allege facts that would give rise to a strong inference of fraudulent intent.  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  This may be shown by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Id.*  Reckless conduct may be "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care," or an "egregious refusal to see the obvious, or to investigate the doubtful."  *Id.* at 308.  As long as the facts will support a strong inference of fraudulent intent, they need not be so specific or detailed as to create a "nearly impossible pleading standard."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999); *see also Ganino*, 228 F.3d at 169 (great specificity not required).  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts."

16

*Novak*, 216 F.3d at 308.

The complaint has adequately alleged scienter.  *See Press*, 166 F.3d at 538.  Dismissal for failure to plead fraud with particularity is denied.

## Conclusion

For the reasons stated above, the Defendants' Motion to Dismiss (Doc. 8) is **denied**.

Dated at Burlington, Vermont this 9th day of January, 2006.


/s/ William K. Sessions III
William K. Sessions III
Chief Judge